0055 Leslie Saketkoo. And I will help me with pronunciation just so I don't get it wrong when you get there versus Tulane. Ms. Lockett, you're up. Thank you, Your Honor. May it please the Court. My name is Melanie Lockett and I, along with Michael Allwise, represent the appellant, Dr. Leslie Ann Saketkoo. The issue is whether the District Court erred in dismissing Title VII claims of gender discrimination, retaliation, and hostile work environment on motion for summary judgment when genuine issues of material fact exist. We submit that the District Court erred when it ignored and improperly weighed evidence and misapplied the law. As to the gender discrimination claim, applying the McDonnell-Douglas burden-shifting framework to the record, appellant has submitted evidence sufficient to establish a prima facie case of gender discrimination. As this Court well the appellant to be a member of the protected class. She is. That is undisputed. She's a female. It requires that the appellant establish that she is qualified for the position. Again, whether or not this is disputed is uncertain based on the recent briefs, but she's certainly qualified. Tulane did offer her a position of employment as a physician with their School of Medicine in 2014. She accepted the position and commenced working there in 2015. She maintained that position and she did it well. She received reappointment letters annually with salary increases. She's an internationally renowned expert in scleroderma, pulmonary hypertension, sarcoidosis, and interstitial lung disease. She's been a principal investigator on multiple research trials. She's earned accolades including Physician of the Year awarded by the Scleroderma Foundation prior to the alleged acts of retaliation. So we submit that that element is also satisfied. But the crux of the issue as far as gender discrimination appears to be the analysis of the fourth factor. And specifically, the determination hinges upon whether the record includes evidence of disparate treatment of similarly situated employees. We submit that it does. The law on comparators, importantly, as this court has already held, the question regarding whether two employees are similarly situated is generally presented as a question to the jury, not the judge. And that was decided by this court in Wallace v. Seaton. In Wallace, the court provided further guidance in considering whether a comparator is similarly situated and specifically articulated the following considerations. Whether the plaintiff and the proffered comparators held the same job or responsibilities, whether they share the same supervisor or have their employment status determined by the same person, and whether the plaintiff's conduct during the adverse employment action is nearly identical. Importantly, it's not identical, but it's nearly identical. And I'd also like to clarify that in Turner v. Kansas City, the Supreme Court instructed that the burden of establishing a prima facie case of disparate treatment is not onerous. To apply a strict application, even as noted in Wallace, would be contrary to that directive. So, as that burden applies to these facts, here, appellant has proffered male comparators. All of them are doctors, all of them are within the pulmonary section of Tulane School of Medicine, and all of them are supervised by Joe Lasky. Notably, Joe Lasky, Dr. Joe Lasky, who is chief of the pulmonary section, is the individual who setting the expectations and anticipated financial productivity. Which is at issue here, because the adverse employment action sustained, which is undisputed, is the failure to renew or to reappoint Dr. Saketku. And for the alleged reason, the purported reason of financial productivity and the anticipated deficit in her financial productivity. So, the alleged conduct that draws the adverse employment action was Dr. Saketku's anticipated deficit. The male comparators who were proffered by Dr. Saketku, similarly, maintained deficits, had anticipated deficits. In fact, appellant's anticipated deficit was not as great as that of her male comparators. And just for an example, I would like to note that Dr. 184 male, that's how he was identified in the document submitted by the court, had an expected deficit of approximately $25,000 more than the appellant's expected deficit. So certainly, the alleged contract drawing the adverse employment action was similar, nearly identical. In fact, the action of the comparator was worse than that of the action of the appellant here. The male comparators anticipated deficits were not identical, they were worse. Yet, only Dr. Saketku faced the decision and the adverse employment action of non-renewal of her appointment. Now, this is where the inquiry ended with the district court, but we suggest, because this matter is here before this court, and a de novo standard of review, that we should continue with the next portion of the burden shifting framework, which is to examine Tulane's proffered legitimate non-discriminatory reason for taking an adverse action against Saketku. The action is not legitimate, it is mere pretext. Now, the law provides that a plaintiff can establish pretext by showing disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence. Now, as I have set forth in the prima facie element concerning the comparators there, we believe, and we believe the evidence in the record establishes disparate treatment exists, but there is certainly an ample amount of evidence that's been submitted to the court to suggest that the proffered explanation is false or unworthy of credence. Significantly, the contractual language in Tulane's appointment letters specifically provides that the compensation worksheet will be adopted and incorporated into that contract, and that the compensation worksheet is the plan for revenue generation to support a physician's salary based on your assigned duties as outlined in that worksheet, and that's ROA 3324 to 3332. In this particular case, the compensation worksheet was prepared by Dr. Lasky. He set forth the anticipated productivity and deficit for Dr. Saketku. Given the specific express language of that contract, that means Dr. Saketku's financial productivity obligations were guided by that compensation worksheet. Significantly, the documents in the record and the evidence suggest that each and every year, appellant exceeded Tulane's annual earning production goals, including the year upon which Tulane made the decision not to renew her contract. She exceeded the goal by decreasing the expected anticipated deficit by $30,000. As in excess of $30,000, and that's ROA 3084 to 3087. As Tulane even noted in its original brief, Tulane's 30B-6 designee, Margaret Bell, testified that Tulane would likely decide not to renew a faculty member's contract, quote, if the clinical earnings were not as high as the department had anticipated, if the growth over time of the earnings was not as robust as anticipated. Again, where do you determine what is anticipated? By looking at the compensation worksheet. And again, that is set by Dr. Lasky. And Dr. Saketku did in fact exceed those goals each and every year. So the supposed and purported legitimate non-discriminatory reason for the duties and obligations that are set forth in the appointment letters, which suggests that if there is a need or if there is a deficit beyond that which is expected or anticipated, then the remedy is to reduce the salary or implement an action plan. That was never discussed with Dr. Saketku. Another one of Tulane's own 30B-6 witnesses did specifically state that she had witnessed those actions being implemented with other physicians. That wasn't the case for Dr. Saketku. And why would it be? Because she met the goals that were anticipated and set forth. She met her obligations. Moreover, the record establishes that Lasky properly accounted for research funding and financial productivity for males, but he failed to do the same for Dr. Saketku. In other words, when they're looking at the productivity report to show what she actually did earn, her information was false. He deprived her of at least $55,000 worth research funding that should have been considered as salary support. At a minimum, these facts create a genuine issue of material fact as to whether Tulane's explanation was false or unworthy of credence and therefore as to whether Tulane's Crawford non-discriminatory reasons were mere pretext. Now, appellate did satisfy her burden, but she did additionally produce additional information that we characterize as need-to evidence to further the discriminatory animus, which goes beyond the required standard at this stage of the proceeding. The record included evidence of Lasky's abuse of other women. Specifically, the record contains evidence establishing that Lasky called a female physician a bitch, not once, not twice, but three times. Even Tulane's own 30B6 witness, Tiffany Smith, admitted that repeated instances of doing so, referring with that type of profanity to a female with a gender specific word is evidence of gender, maybe, excuse me, evidence of gender discrimination or discriminatory animus. Well, at this motion for summary judgment stage, that's all we need is to create the genuine issue. There are additional, there are a plethora of complaints from women that are in the record and issues, I will say, but some of these issues are sealed and portions of the sealed record. If this court would like me to elaborate upon that, I will do so, but I will also, at this point, unless directed otherwise, will respect the seal and will direct the court's attention to citations in the brief to the extent that's desired. But there was a complaint of gender discrimination asserted by another female physician against Dr. Lasky in the pulmonary section, and we maintain that this evidence is relevant, especially under this court's and its ruling and machinachick. A supervisor's treatment of others in the same pretext class is probative on the issue of discriminatory animus. Moving on to the retaliation claim. As this court is well aware, the prima facie case for retaliation requires that the plaintiff establish that she engaged in protracted activity, she suffered an adverse employment action, and there's a causal link between the protected activity and the adverse employment action. Under the analysis, there are two separate retaliation claims. First is the protected activity of Dr. Saketku complaining to Dr. Lorianne Wilde, a superior section chief, regarding Lasky's treatment of her, her harassment of her, and that of other women. Under Anderson, this court has held that a plaintiff's complaint concerning the actual conduct prohibited under Title VII, and specifically complaining that she was treated differently than her white male counterpart, was sufficient to manifest protected activity. That's what Dr. Saketku has done. That's what she put in her declaration. The evidence is the record. She has repeatedly made complaints, not just about harassment, not just about toxic work environment, but specifically about complaints of his treatment of her and other women. That's OIE after the pinnacle of the harassment on September 13th of 2018. After doing so, she sustained adverse employment action. Specifically, not only was her contract not renewed, but it was not renewed because Dr. Lasky commenced a campaign to divorce Dr. Saketku after that September 13th incident. That campaign commenced in September, went through October and December, and there are records of the communications in which he solicited information from persons about any negative information he could find about her. He spoke with Dr. Ham, who is the chair of the School of Medicine. He spoke with the general counsel at Tulane, and albeit in February, they made the decision not to renew her. Now, Tulane will argue it's an issue of temporal proximity. To the extent that temporal proximity is considered, there is temporal proximity between the actual complaints and the protected activity and the adverse employment action of commencing the complaints and this campaign to divorce Dr. Lasky. But there's also pretext, which satisfies the causal link. The second claim of retaliation is based on an interference with Dr. Saketku's post-Tulane employment. Specifically, Dr. Saketku participated in an OIE investigation regarding her gender discrimination claim in or about May of 2019. In September of 2019, she participated in a telephone conversation, which is recorded, and that recording is part of the record, in which she was advised by Dr. Patel at UMC that he would not hire her because he was directed not to do so by Dr. Ham. This is, again, evidence that creates a genuine issue of material fact, such that the motion for work environment claim, we submit that the court ignored evidence. The primary issue with the house to work environment claim is that the court found that it was not sufficiently severe or pervasive enough to interfere with her employment. We recognize the burden that this court has set forth under Stewart, that a house to work environment claim must be so severe and pervasive that it destroys an employer's opportunities to succeed. That is what we have here. Dr. Saketku brought research opportunities to Dr. Lasky. Dr. Lasky took the information from her, and another male doctor in his department took over that research. She is responsible for generating funds and to perform research, and he specifically destroyed that opportunity for her. He did that twice. It was another research opportunity she brought to him. She had everything ready to research trials to start admitting patients that would have generated funds to support her salary, so to speak. He refused to allow her to proceed with that, and it looks like I'm out of time. Finish your sentence. If you will admit sentence, finish your sentence. Thank you, Your Honor. He didn't afford her the opportunity to do that, and instead allowed another male physician within that section to proceed with his research trial and inability to generate additional funds to support a salary. Thank you. All right. Thank you. You've reserved your rebuttal time, so let's hear from Tulane. I am so technologically challenged, Your Honors. Good morning. Julie Lividay from Jeff McCall on behalf of Tulane University. Good morning. Thank you. Good morning. Your Honors, there is no evidence of discrimination or retaliation on the facts of this case. Dr. Sackett-Kuhn's year-to-year appointment at Tulane Medical School was not renewed in 2019 because in each of her four years at Tulane, she failed to generate sufficient revenue to cover her salary, which is a basic requirement of clinical faculty at the school. The university lost money on her for four straight years. This is a legitimate, non-discriminatory reason to not a contract. Let's look at the judge's reasoning, which is well supported in the case law, that if a plaintiff fails to make out a prima facie case on any of the claims, summary judgment is appropriate. She failed to make out a prima facie case on each of her three claims. Well, as counsel said, I mean, whether or not it's true or not, normally in these cases, making a prima facie case is really not all that hard. And a lot of times, defense counsel will sort of spot the prima facie case, just so we're assuming without agreeing, and just move on, you know, to the next point, figuring that even if she did, da-da-da-da-da-da, so it's a little unusual. I won't say unusual, but I mean, the prima facie case is not designed to be that difficult to get over the hurdle. Well, here, it seems a little unusual that the fight was at the prima facie stage, particularly since this went to summary judgment. But anyway, that's just my observation. That's a good observation, Judge Stewart. And I, myself, have gone past the prima facie case and moved right into the merits of an argument. But actually, her issues here in proving a prima facie case would become her same issues at the pretext stage if it went past that. And the issue of comparator is large here. It's the fourth factor in McDonnell Douglas, and the comparator issue is serious, and here's why. We produced 30,000 pages of documents in this case. The plaintiff's burden was to find at least one male faculty member in her classification, which is associate professor, who was treated more favorably than she. She did not. She did not find a single appropriate comparator, because those she selected as in her brief. And then she also compared herself to her supervisor, Dr. Joe Lasky, who is a full professor and has a huge amount of administrative responsibilities. So his job is not properly comparable to her. A failure to identify a potential comparator alone justifies dismissal under this court's precedent, such as endowed chemical. The judge followed the right identical standard that is correct under this court's case law. So junior faculty to Dr. Sakaguchi are younger, less experienced, and in a different job classification. As the court below pointed out, some also had teaching responsibilities for medical students and residents. Would her comparators have had to be female plus the factors that you're arguing, or the gender difference wouldn't make a difference if the other things made out? She needs to find a male comparator who was treated better than she. So the male has to be in the same, has to be a relatively nearly identical in job duties supervisor and that sort of thing, as well as in disciplinary record, which is another part of this that I'm going to talk to you in just a second. So some of her alleged comparators were hospitalists. She was not. She had solely clinical duties. All of this is obvious from the work she produced. So she is able to find out what all of these people do. But when she argues reciprocally that her productivity deficits were not as significant as others, it's a wholly misplaced argument. They are all doing entirely different things. They have different job responsibilities than she did. All but Dr. Lee Jr. They were teaching. Dr. Lasky had administrative duties. Some were hospitalists. This is an apples to oranges comparators. And the judge in the court below was right that these are not appropriate comparators. Further plaintiff's reliance on the Wallace case for the suggestion that similarly situated determination should be made by juries is wrong. It's just wrong. If the Wallace decision required that practically every Title VII case in the Fifth Circuit be flooded, this court has continued to affirm summary judgments in Title VII cases where the plaintiff failed to identify a similarly situated comparator since the Wallace decision, for example, in Patrick v. Wal-Mart this past June. The comparative argument fails for a second reason, Your Honors. It's the comparable violations history factor. It's not only about the one deficit worksheet for 17-18. Plaintiff focuses on predicted revenue deficits evidenced on that worksheet for everybody and pronounces that hers were not as severe as some of the males. We can agree to disagree on that, but the reasons for her non-renewal, her violation history, so to speak, went well beyond the 2017-28 projected deficit on that worksheet. The non-renewal centered around four years of financial underperformance. Her annual reappointment letter she signed every year clearly said that the expectation is that she generates sufficient revenue to cover her salary. All clinical faculty have this obligation. She never met that obligation, but she could have been granted an exception to that revenue generating requirement if, as the dean testified at his deposition, there was a compelling argument to keep her on because she contributed to the other missions of the school, education and scholarship. She didn't have significant teaching duties for residents or medical students. She, as the dean pointed out, did not have any large federal grants, and so she didn't contribute further to the mission of the school. I don't mean to disparage Plaintiff. She is a very qualified rheumatologist and does a great job servicing a very small number of people with serious diseases. But, for example, in 2018, you can see from record on appeal document 1927, all clinical faculty were told that the goal for 2018 was going to be to see eight patients per half day in clinic. She failed to do this all year. As Joe Lansky testified in his deposition, he waited for her to achieve this metric, and she never did, and she was not significantly involved in the education mission and had no notable publications or federal grants. So the dean had no viable reason to excuse her productivity deficits, and he reasonably determined that non-renewal was appropriate. Plaintiff, in talking about her competitors, made no effort to compare her scholarship record, her contribution to the education mission, the number of patients seen, to these younger male comparators that she pointed out. So she also did not satisfy the comparable violations factor. Turning to the hostile work environment, Your Honor, there's a long-standing principle in Title VII cases establishing that Title VII is not a general civility code. This principle was first enunciated by the Supreme Court in Uncal and has been noted by this court in many decisions, including West v. City of Houston in 2020. And this case is not unusual. The behavior complained of in this case was by no means warm and fuzzy, but it represents the kind of workplace confrontations, indignities, and slights that occur every day across the world. Title VII does not prohibit such behavior. Employment practices are not unlawful just because they may be imperfect or offensive to some. Behavior that entitles a plaintiff to high-expectation workplaces are not against the law. The record in this case abounds with testimony about the fresher-cooker nature of academic medicine, which the dean summarized as more like ER than Marcus Welby, M.D. Now, I may be the only one in this proceeding today old enough to know who Marcus Welby was, but he was a kindly, great man. You're kind counsel. You know good and well that I'm old enough to know who Marcus Welby was. You may not want to say that to the other judges, but I'll own it. Melody. All right. Thank you, Judge. So, the kindly, you know, M.D. who has time for everybody does not exist in academic medicine, where there are intense demands, big egos, competition for grants, extremely ill patients, scholarly articles to write, long hours, and fewer resources than in a private setting. Dr. Lasky, the alleged creator of plaintiff's claimed hostile work environment, indisputably had run-ins with females and also with males, including the dean from the dean's own testimony. We don't contest that, but the run-ins were about workplace issues, not gratuitous denigrations based on gender. Lasky was described in depositions as, quote, tough on all of us, abrasive, demanding, maybe a bully, but smart, hardworking, and the leader of a very successful academic program. So, if Dr. Lasky is a harasser, as opposed to simply an extremely successful surgeon and section chief who consistently demands the best from himself and others and can be caustic in the process, he is what courts have called an equal opportunity harasser. He has a tendency to lose his temper, no doubt about it, but he did so towards males and females just the same. Every witness in this case has a story about getting on the wrong side of Dr. Joe Lasky. This fact negates any claim that the behavior was based on gender, because both sexes were recipients. The court below correctly found there is no evidence that Dr. Lasky engaged in any behavior towards plaintiff because of her gender. No gender derogatory comments have been identified, no inappropriate touching is alleged. So, the judge analyzed the key complaint of interactions between the plaintiff and Dr. Lasky. These included what plaintiff called towering over her in a treatment room when she was sitting in a catheterization calculation, holding up his hand towards her face to indicate he had no time to talk to her at that point, and shaking his finger in her face while red-faced and trembling to repeatedly say that she was in error about what she was saying, and that occurred on one occasion. As to this last episode, she admits that she was able to get away simply by walking off, that he never touched her, and that she does not believe he intended to inflict physical harm. So, the judge, noting that these incidents had occurred over the course of four years, you know, a great deal of time in between each one, and in not one of them was there any suggestion that her gender was a factor, the judge correctly found this proof fell well short of the prima facie requirement of a workplace permeated with severe pervasive misconduct. So, were there workplace slights? Yes. Does that constitute actionable harassment? No, because such day-to-day garden variety insults and indignities do not rise to the level of a hostile work environment. They're not pleasant, but they're not illegal. Another element of the prima facie case is that the behavior must be severe or pervasive. The judge correctly found that it was not. Five incidents over four years did not constitute pervasive. This is totally consistent with this court's decision in the Kumar case, for example. Pervasive harassment is the kind of behavior found in the Lauderdale case, where the harasser called the plaintiff 10 to 15 times a night for almost four months. Now, that's pervasive, but the behavior here was not found to be severe because the court analyzed Fifth Circuit cases in which similar behavior was found not to be severe. Let me ask you this. Let me answer this question, which cuts across all the arguments. Our earlier cases have been dealing with 12B6s and in some yesterday, so we finally get to a summary judgment case. You mentioned something about 30,000 pages worth of documents here. Yes, sir. Contextually, this sounds almost like a trial in terms of the girth of some of these points. I can see how it would be easy with this much evidence that even though Rule 56 says construing the allegations in the light most favorable to the non-movement, if they're close calls, but this is almost teed up like a trial. I guess my question at this point is to make a fair point that on some of these close arguments, the judge may have, quote, weighed them as if he would in the bench trial versus sides close but not. That's just kind of you follow what I'm saying? I mean, it's what you've said. I mean, you got a ton of stuff. The only thing here just looks like it wasn't a trial, but otherwise, so on the close issues, plaintiff argues and she'd come back on rebuttal. Or are there anywhere you would say it's at least close on the fact issue or is your argument, you know, no matter what standards applied, she loses on the points? Well, the judge didn't make credibility assessments about this testimony, your honor. And he had plenty of case law to look at about whether the behavior complained of such as yelling and shaking fingers and all that constitutes severe and it doesn't. So I think he was, it wasn't that difficult for him to decide that that was not actionable. But I would like to talk about the Me Too evidence for a second, your honor, the declarations that plaintiff submitted from other women. The Me Too evidence was, of course, considered by the judge, but given little weight for a well-founded legal reason. Plaintiff had not witnessed it. Precedent from this court compels that result. In fact, plaintiff was not even employed at Tulane when these incidents occurred. They were not even part of her work life. She hadn't joined the Tulane faculty yet. These incidents could not affect her own experience because she wasn't there. Under dicta in the Hernandez case, harassment of others is relevant if plaintiff experienced it in the workplace alongside them. Here, plaintiff did not. She wasn't even there yet. There was one episode that she talked about that she was employed at Tulane and had talked to the physician who she claimed was crying because of an interaction with Dr. Lasky. That physician is named Dr. Narita Parada. We submitted an affidavit from Dr. Parada who said, Dr. Lasky didn't make me cry. He didn't discriminate against me. He was always supportive. So that question about whether or not the one incident plaintiff lived through was answered by the physician who was crying saying, no, no, no, this wasn't discrimination, you know. Because plaintiff did not witness the alleged incidents involving the other women, the Me Too evidence cannot be used to upgrade her own experience to the level of severe or pervasive. These incidents are irrelevant because they were not part of her personal experiences. Two retaliation claims, your honors. One is pretty straightforward, right? The dean summoned her to a meeting which she saw repetitiously reported. I usually get mad when that happens to my clients, but in this case, it was a big help because it showed that the dean informed her that her contract was not going to be renewed before she spewed forth a variety of characterizations of Dr. Lasky's behavior that she wanted the dean to know about. Okay? So the retaliation claim requires a predicate engagement in protected activity and then a that cannot be a proper retaliation claim. There's no doubt about the fact that Dean Ham was the decision maker. Plaintiff testified in her deposition that she had no idea whether he was aware that she had complained to her work colleagues about Lasky's abusive behavior before that meeting. Dean Ham denies knowing anything about her complaints before that meeting. And the Fifth Circuit consistently requires proof of actual decision maker knowledge to support a case. Plaintiff would have the court believe that she did complain to Tulane about discrimination prior to the February 2019 meeting with the dean. She says in her declaration that she told her work colleagues about his behavior. She didn't use the word discrimination, but she complained about things that he was doing to her. She admits that she did not make a discrimination claim to her employer until after she was told of the non-renewal. She once called the appropriate office at Tulane to make a complaint, spoke to an administrative assistant, asked for forms to make a complaint, mentioned Dr. Lasky's name, did not mention the word discrimination, but never followed through at that time. And then the non-renewal is told to her. So there's no protected activity that is the predicate act of the non-renewal. The second retaliation claim is not straightforward. It is a claim that Dean Ham retaliated against her for her discrimination complaint by instructing the University Medical Center, which is a non-Tulane entity, it's the former charity hospital here in New Orleans, not to hire her. There's no doubt that a negative reference can be a retaliatory act, except a negative reference never happened here. The reason this issue even arises in this case is that plaintiff was trying to get a job at UMC. She was on the telephone with the chief medical officer at UMC. She recorded, unbeknownst to him, their conversation. This conversation occurred in the summer of 2019, long after her February meeting with the dean, where non-renewal was told. As we now know, because Dr. Patel has given an affidavit in this lawsuit, which is ROA 1954, Patel's statement to plaintiff on the telephone was not true. Okay? On the telephone, he told plaintiff that he didn't think he could move forward with her hire, because when Dean Ham suggests he shouldn't hire somebody, he won't hire him. So that's what the plaintiff knows, admittedly. This was a lie. And Dr. Patel, whether he did it to get her off the telephone, to cover himself, to look like he had more support for his own decision, who knows? It doesn't matter. It's irrelevant. The relevant thing is that the conversation never happened. The alleged retaliatory act by the dean never occurred, and both the dean's testimony and Dr. Patel's testimony, the plaintiff has no personal knowledge of this conversation. So she can't move forward with any proof, because she wasn't there. And the two people who were there say it never happened. So there's this funny little glitch where Patel alleged that he couldn't move forward. Counsel, you've exceeded your time. I'll give you a concluding sentence to wrap up here. I'm happy to stop, Judge. Thank you very much. Yes, I am. I mean, that was the end of it. Patel says it never happened, and so does the dean. So thank you very much. All right. Thank you for your argument. All right. We're back to you, Ms. Lockett, for a rebuttal. Yes, Your Honor. Specifically to address your point, you're exactly right. The 10,000 pages or 20,000 pages that were produced in the discovery, that's not a part of this record. It's so many of the things that Counsel for Tulane has mentioned today. And this is a court of record, not that it's relevant. But the record itself is voluminous enough to establish the depth of facts here and suggest that this is not appropriate on motion for summary judgment and should proceed to trial on the merits. But specifically, I would like to address a few things. Number one, the evidence. You hit the nail on the head. There was weighing of evidence and credibility determinations. There had to have been. The district court judge noted that he was disregarding certain allegations and attestations and Dr. Sackett-Coons affidavit because it was self-serving. But this court has held that conclusory self-serving statements should not be considered in an affidavit. However, it can be self-serving and still considered and admitted if they are personal statements, excuse me, statements of fact made on personal knowledge. Let me ask you this. I kind of can and so forth. I mean, in their reasons, I mean, it looks like that would be some somewhat empirical to, you know, stack up the money and this is how much to raise and compare them. I mean, not subject to credibility and so forth. So if they asserted we didn't renew you because you were supposed to raise, you know, whatever money or whatever it is academic people are supposed to do. And that's an objective fact that's there. I mean, that's not a credibility issue. So is it your position she did raise all the money that she was supposed to or satisfy whatever other these qualifications were? Well, first, your honor, I do need to address the premise of your question. You're stating that there was a requirement that she not have a deficit. It seems to assume that or that's my interpretation of the question. I may have misstated. I didn't mean to throw you a curve. I guess I was understanding the argument to be that, you're hired, you have these requirements, you know, whatever it is in academic, get grants, raise money, whatever they are. And so my sense is part of their responses back is she had these criteria. She didn't meet them. Those would be objective. So those wouldn't be credible. Maybe I have it wrong. No, you're saying their argument accurately, your honor. And I'm telling you, that's not the facts, the facts of the record. She keeps saying that she didn't meet the requirement to cover a salary. There's no such requirement. Her requirement, according to the appointment, is to satisfy the financial productivity expected of her and anticipated as set forth in the compensation worksheet. She did that every single time. Their legitimate, purported legitimate reason is completely false and unworthy of treatment. I have cited the language of the appointment letter, which suggests that. Also, Tulane says itself, every single position in that department is held to be accountable as to those financial productivity goals set forth in the compensation worksheet. That's what makes these male comparators appropriate comparators. These additional things that counsel has mentioned, them being young, doing different duties, that's nowhere in the record. The only thing in the record is the distinction between their titles. There is no distinction between the responsibility as acknowledged by Tulane. All of them had the responsibility of meeting their productivity goals as set forth by Tulane. Leslie Saketku did that. Yet she, not any of the other male comparators, she was the one that was non-renewed. There is discrimination here. There is evidence, at a minimum, that there are disputed issues of material fact. The motion for summary judgment should not have been granted in part. And we respectfully suggest to this court that the set for trial on the merits. I'd like to continue with the evidentiary point with my remaining minute. To the extent necessary, it floors me that this lie, it was a lie. We have a recording of Dr. Nirav Patel saying he was directed by Dean Ham not to hire her and he identified her by name. That is on the recording. Yet he comes back two years later at Tulane's prompting and says that's a lie. That creates, at a minimum, a genuine issue of material fact. The same thing with these doctors who are still employed at Tulane saying, oh, I wasn't discriminated against. Yet, contrary to what Ms. Lividay said, Dr. Saketku witnessed Narita Parada crying coming out of conversations. I would direct this court's attention to the recording of the termination meeting in which, at that time, Dr. Saketku specifically detailed her knowledge and coming from Lansky to herself and other women. Absolutely gender discrimination here. Your Honors, we respectfully submit this matter to the court and request that this appeal be granted the judgment reversed and the matter remanded for trial. All right. Thank you, Ms. Larkin. Thank you to both counsel for your robust briefing and argument in the case. This concludes the arguments in this case, and it will be submitted for decision. Both of you may be excused. Thanks to the court.